UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ALEXIS SCHARP,** | **2:19-CV-13287-TGB-DRG** |
| Plaintiff, | |
| vs. | **ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 19)** |
| **VAN BUREN PUBLIC SCHOOLS,** | |
| Defendant. | |

According to the Complaint in this case, while working as a bus driver for Defendant Van Buren Public Schools, Plaintiff Alexis Scharp was sexually harassed by a coworker so consistently that it created a hostile work environment. Despite Scharp's numerous reports to her employer, she alleges, Van Buren Public Schools did little about the harassment for more than a year. And after the harassing employee was eventually fired, Scharp says, other co-workers then retaliated against her because she turned him in to management. Pending before the Court is Defendant Van Buren Public Schools' motion for summary judgment. In support of the motion, Defendant argues: (1) Scharp's suit is procedurally untimely, (2) Scharp's alleged harassment was not severe enough to be legally actionable, (3) Defendant was never on notice of any

1

harassment, and (4) any retaliation against Scharp was not serious enough to constitute unlawful retaliation.

The motion has been fully briefed and the Court heard oral argument on November 17, 2021. For the reasons stated below, Defendant's motion for summary judgment is **DENIED** with respect to Scharp's hostile work environment claim, and **GRANTED** with regard to Scharp's retaliation claim.

## I.    Background

Alexis Scharp began work as a bus driver for Van Buren Public Schools in August or September of 2017. Scharp Hiring Letter, ECF No. 19-3, PageID.376. Scharp reported to Kim Searcy, who was a supervisor within Van Buren Schools' Transportation Department. Searcy Dep., ECF No. 19-4, PageID.384. Ms. Searcy in turn reported to Defendant's Human Resources director, Abdul Madyun. *Id.* at PageID.385. Ms. Searcy oversaw approximately ninety employees. *Id.* at PageID.384. Searcy testified that she "definitely had influence with hiring," and that with respect to terminations, she "would be included in many discussions if there was something that came up in the department." *Id.* at PageID.384. Ms. Searcy also testified that she had a role in employee discipline, and had discretion to deal with minor disciplinary issues such as tardiness or driving complaints with verbal warnings, or to escalate

matters to the Human Resources department when appropriate. *Id.* at PageID.386-87.

Mr. Madyun says that Ms. Searcy "had influence, but not significant control" over hiring, firing, and discipline. Madyun Decl., ECF No. 19-5, PageID.422. He further testified that she was "not considered upper management and could not make a tangible employment action." *Id.* He says that she performed only ministerial screening tasks with respect to hiring, and that Mr. Madyun, not Ms. Searcy "oversaw" termination investigations. *Id.* at PageID.422-423. So too with discipline: Mr. Madyun says he had "ultimate authority," and he "led investigations and came to a conclusion with input from Searcy" and from the affected employee's union representative. *Id.* According to Mr. Madyun, while Searcy handled "everyday and minor Transportation Department infractions, such as tardiness or absences" through "verbal or written reprimands," she could not unilaterally suspend an employee. *Id.* at PageID.423.

The Court now turns to the events that gave rise to this case. Scharp says that her first unpleasant run-in with her coworker Ryan Hughes, a bus aide, came shortly after she was hired in August or September of 2017. Mr. Hughes tried to hug her, and Scharp made it clear to Hughes that this was unwelcome. Scharp Dep., ECF No. 19-7, PageID.455. Ms. Scharp says about two months after she was hired, some

time in late 2017, Hughes "groped" her, attempting to pick her up "between [her] legs with one hand as he walked by [her]." *Id.* at PageID. 456. Ms. Scharp says she told Ms. Searcy about the incident and provided Ms. Searcy with a written report. *Id.* Ms. Scharp says that after she reported the groping incident, Mr. Hughes "found out that [Scharp had] reported" him, and Hughes began calling Scharp on the phone and contacting her by Facebook messages, telling her that she "need[ed] to watch what [she said] and that [she] was a bitch for telling on him." *Id.* at PageID.457.

The other incidents Scharp outlines in her deposition are not clearly dated, but appear to have taken place mostly in late 2017 or early 2018. These include:

- Hughes offering Scharp money "if [she] wanted to work for it," Scharp Dep., ECF No. 19-7, PageID.457, in approximately October 2018 *Id.* at PageID.462.

- Hughes showing Scharp a video on his phone of himself having sex. *Id.* at PageID.457. Scharp says she reported this to Searcy in approximately December 2017 or January 2018. *Id.* at PageID.459.

- Other unwelcome calls and texts throughout late 2017 and 2018. *Id.* at PageID.457, 460-61.

- Hughes groping Scharp while he stood in line behind her as she attempted to clock out. *Id.* Scharp says this happened in approximately December 2018. *Id.* at PageID.462.

- Hughes making comments about Plaintiff's appearance and clothing throughout late 2017 and 2018. *Id.* at PageID.457, 460-61.

In sum, Scharp describes Hughes' harassment as continuous from late to 2017 to late 2018, stating that it included at least two instances of unwanted and sexually invasive physical touching, and that Scharp reported each incident to Ms. Searcy contemporaneously.

As Sharp's supervisor, Ms. Searcy paints an entirely different picture. She says that Scharp only approached her on two occasions to complain about Hughes. Searcy Dep., ECF No. 19-4, PageID.394. Searcy says that Scharp's first report, which Searcy estimates came sometime in 2018, was verbal: Scharp said that Hughes "made [Scharp] feel creepy because [he was] always asking to hug her" and that she did not want Hughes to work as a bus aide on her bus, but did not detail any more serious harassment. *Id.* at PageID.394-95. Searcy says that after that conversation, she tried to make sure that Hughes was not assigned to work as a bus aide on Scharp's bus. *Id.* Searcy also says that she spoke to Hughes and told him he needed to stay on his assigned bus, but did not tell Hughes that Scharp had complained. *Id.* at PageID.397, 413-14. It does not appear that Searcy addressed Hughes' harassment of Scharp

specifically in that conversation, although Searcy testified that she *might* have told him not to ask female employees for hugs. *Id.* at PageID.409, 413 ("Q: Did you do anything to specifically address the harassment and make sure that it would stop happening? A: No, I guess I did not do enough. . . . Q: Did you tell Ryan that he can't ask female employees for hugs? A: I'm trying to remember . . . I can't say hundred percent, but it feels like I did say something like that."). Searcy says she does not remember making a written record of this initial complaint or receiving one from Scharp, but that it was her general practice to keep a written record of such reports. *Id.* at PageID.396-97. Ms. Searcy says she did not escalate Scharp's complaint to Mr. Madyun because the complaint seemed relatively minor. *Id.* at PageID.413.

According to Searcy, Scharp did not complain again until approximately January of 2019. That complaint arose because another bus driver, Kaylyn Walz, also alleged that Hughes had harassed her. *Id.* at PageID.398. At that point, Searcy asked both Scharp and Walz to submit written reports, and the matter was escalated to Mr. Madyun. *Id.* Mr. Madyun describes this 2019 report slightly differently. He testified that in December 2018, Scharp and Walz came to him directly the day before the holiday break and reported Mr. Hughes' misbehavior. Madyun Dep., ECF No. 19-6, PageID.432-33. Madyun says that he immediately asked both women to prepare written reports.

6

In any event, it is undisputed that when school resumed in January, 2019 after the holiday break, Madyun received written statements from Scharp and Walz and initiated an investigation—during which he consulted Ms. Searcy. *Id.* at PageID.433. Mr. Madyun says Searcy never told him that Scharp had made any complaints prior to December 2018 (other than, perhaps, the initial verbal complaint). Madyun Decl., ECF No. 19-5, PageID.423. Scharp says that during a meeting between her, Madyun, Searcy, Walz, and several other employees, she told Madyun that she had submitted several written reports to Searcy in the past. Scharp Dep., ECF No. 19-7, PageID.463. Scharp says that Madyun told Searcy to provide him with those reports, but, according to Scharp, Searcy said that she had lost them, and no longer had them. *Id.* Searcy testified that she did not remember ever telling Mr. Madyun that she had lost any written complaints, and that it would have been her practice to send Mr. Madyun any relevant written materials that she had. Searcy Dep., ECF No. 19-4, PageID.405-406.

Ms. Searcy denied remembering any complaint by Scharp in late 2017 that Hughes had grabbed Scharp by the crotch. *Id.* at PageID.407. Ms. Searcy also denied receiving any complaints from Scharp about Hughes commenting on Scharp's appearance or clothes, other than in her initial 2018 verbal complaint. *Id.* at PageID.408. Ms. Searcy also denied receiving any complaints from Scharp about Hughes texting or calling

her inappropriately other than those made in the January 2019 written report. *Id.* at PageID.409. Ms. Searcy also denied receiving any report about Hughes showing Scharp a video of him having sex or any report of Hughes groping Scharp while she was in line to clock out of work. *Id.* at PageID.410.

After the January 2019 report, Mr. Madyun placed Hughes on leave while Madyun investigated. Madyun Decl., ECF No. 19-5, PageID.423-24. Ultimately, Madyun decided that Hughes should be terminated, and offered him the choice to resign or be fired. Madyun Dep., ECF No. 19-6, PageID.433. Hughes resigned. *Id.*

Scharp says that after Hughes left Van Buren Schools, her coworkers, who were sympathetic to Hughes, began to harass her. She submitted four reports of this harassment (three of which bear the same date, January 18, 2019) to Mr. Madyun. Harassment Reports, ECF Nos. 19-12, 13, 14, 15. The behavior complained of included:

- A coworker "talking about [Scharp] in negative ways to other employees" and "dirty looks and negative attitudes" directed towards Scharp. First Jan. 18 Incident Report, ECF No. 19-12, PageID.511.

- Another coworker posting negative things on Facebook about Scharp, encouraging other bus drivers to give her the cold shoulder in the break room, and "reporting anything [the coworker] sees

[Scharp] do that [the coworker] thinks [Scharp] could get in trouble for." Second Jan. 18 Incident Report, ECF No. 19-13, PageID.512.

- Several employees circulating a petition to rehire Hughes. Third Jan. 18 Incident Report, ECF No. 19-14, PageID.513.

- Ryan Hughes' cousin—who was also a bus aide—approaching Scharp after she clocked out and questioning her aggressively about Hughes' termination and the subsequent resignation of Kaylyn Walz. Feb. 4 Incident Report, ECF No. 19-15 PageID.514-515.

In response to these complaints, it appears that Mr. Madyun held at least one, and as many as three, meetings. At the first meeting, approximately in the second week of January, Madyun paid all Transportation Department employees for an extra hour of work to ensure attendance, and explained that retaliation would not be tolerated. Madyun Dep., ECF No. 19-6, PageID.435-36. According to Scharp, Madyun "put everything out on the table," and explained that Hughes had resigned. Scharp Dep., ECF No. 19-7, PageID.464.

According to Scharp, the second meeting was less formal, and was held about a week later, after Madyun learned about the petition to rehire Hughes. According to Scharp, Madyun told everyone to stop bothering her, and that the petition needed to stop circulating. *Id.* at PageID.465. The third meeting was held sometime later, and Madyun admonished transportation department employees to stop posting about

the situation on Facebook. *Id.* at PageID.467. Scharp says that while the Facebook posts and petition stopped after Madyun's meetings, she would still "get the rude stares and just random comments and everything." *Id.*

## II.   Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. "[A] mere scintilla of evidence in support of the nonmovant's position is not sufficient to create a genuine issue of material fact." *Towner v. Grand Trunk Western R. Co.*, 57 Fed.App'x. 232, 235 (2003) (citing *Anderson*,

477 U.S. at 251-52). Rather, the non-moving party must present sufficient evidence as to each element of the case such that a trier of fact could reasonably find for the plaintiff. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).

Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.   Discussion

Scharp's two-count complaint alleges hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). Scharp also alleges unlawful retaliation in violation of the same statutes.

### a.   Hostile Work Environment Claim

To establish a prima facie claim of a sex-based hostile work environment under Title VII, a plaintiff must prove that: (1) she belongs to a protected class; (2) she was subject to unwelcome harassment based on sex (3) the harassment unreasonably interfered with her work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) there is some basis for employer liability. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009); *Hunter v. Gen. Motors LLC*, 807 F. App'x 540, 544-45 (6th Cir.

11

2020). The analysis of hostile work environment claims under ELCRA is "identical" to the Title VII analysis. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012). Defendant argues that Scharp's suit is not timely, that Scharp cannot show employer liability, and that the alleged harassment was not severe enough to be actionable.

### i. Scharp's suit is timely

A plaintiff suing under Title VII in Michigan must file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the conduct complained of, or any subsequent suit in federal court will be barred. *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 622 (6th Cir. 1983). Van Buren argues that, because Scharp did not file a charge with the EEOC until February 19, 2019, consideration of any conduct that took place before April 25, 2018 (300 days prior to her filing date), is time-barred. Def's. Mot., ECF No. 19, PageID.343. Scharp responds that her claim is premised on a continuing-violation hostile workplace environment theory, and that her claim is composed of "a series of separate acts that collectively constitute one 'unlawful employment practice.'" Pl's. Resp., ECF No. 20, PageID.585. Thus, Sharp argues, because the most recent unlawful acts occurred within 300 days of Scharp's EEOC charge, her EEOC charge regarding the entire course of conduct was timely.

Scharp's claim was timely. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Therefore, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period . . . Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* That is what happened here. Defendant misinterprets *Morgan*, and relies only on the portions of that case discussing discrete discriminatory acts—which are not at issue here—not hostile work environments.

To the extent that Defendant may argue Scharp's claim is more properly characterized as a "discrete discriminatory act" claim, the Court cannot agree. Scharp does not complain of termination, demotion, failure to promote, or any other specific adverse employment action that has traditionally fallen under the "discrete act" umbrella. *Morgan*, 536 U.S. at 114. Instead, Scharp's claim resembles the definition of a hostile work environment advanced by the Supreme Court in *Morgan*: the "very nature [of a hostile work environment] involves repeated conduct. . . . It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its

13

own." *Id.* at 115. Such was the experience of Ms. Scharp. According to the Complaint and the evidence, Hughes repeatedly harassed her for more than a year. While some of the incidents—such as Hughes' crude comments—might not be actionable on their own, the series of actions and statements taken together over time support Scharp's claim of a hostile work environment. Therefore, Scharp's EEOC charge was timely filed, and this suit was too.

> ### ii. There is at least a genuine dispute that harassment was sufficiently severe to support hostile work environment claims under Title VII and ELCRA

To support a hostile work environment claim under Title VII and ELCRA, harassment must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Warf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013)(internal citation omitted). The Sixth Circuit has directed lower courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id.* Although the Sixth Circuit has set a "relatively high bar" for hostile work environment claims, *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017), a reasonable jury could conclude that the conduct here meets that bar.

Mr. Hughes allegedly: (1) groped Scharp on two occasions, Scharp Dep., ECF No. 19-7, PageID.456, 457; (2) attempted to hug Scharp despite her making clear that this was unwelcome, *Id.* at PageID.455; (3) harassed Scharp via phone calls and texts using sexually offensive language, *Id.* at PageID.459; (4) sexually propositioned Scharp on multiple occasions, *Id.* at PageID.460; (5) commented on Scharp's appearance, clothes, and the like on multiple occasions, *Id.* at PageID.457, 460-61; and (6) showed Scharp a video of Hughes having sex. *Id.* at PageID.457. As a careful review of Sixth Circuit cases demonstrate, the sexually offensive and invasive physical touching to which Scharp was subjected, coupled with repeated unwanted comments and other harassment, is a sufficient basis for a reasonable jury to find in Scharp's favor.

The Sixth Circuit has often held that unwanted physical touching of a sexual nature, particularly when combined with other harassment, is sufficient to support a hostile work environment claim. For example, in *Williams v. Gen. Motors Corp.*, a plaintiff was the victim of several pranks, had a box thrown at her, and was subjected to at least five crude comments. 187 F.3d 553, 563-64 (6th Cir. 1999). More importantly, on one occasion a harassing coworker wrapped his arm around plaintiff's neck while making sexual comments, and on another occasion that same coworker came close behind plaintiff while she was bent over and made

sexual comments. *Id.* The Sixth Circuit explained that "these incidents, which must be taken as fact for purposes of summary judgment, were not merely crude, offensive, and humiliating, but also contained an element of physical invasion" *Id., see also Balding-Margolis v. Cleveland Arcade,* 352 F. App'x 35, 43 (6th Cir. 2009) (question of fact existed about whether work environment was hostile where supervisor made a series of offensive comments, once untied plaintiff's apron, and once hit plaintiff on the buttocks because "[t]he most invasive conduct included physical touching on at least two occasions").

Even a single incident of offensive physical contact, if sufficiently severe, can be enough to establish a hostile work environment. *See, e.g., Ault v. Oberlin Coll.*, 620 F. App'x 395, 403-404 (6th Cir. 2015) (reversing grant of summary judgment to employer where, on one occasion, plaintiff's supervisor physically pinned her against a dish rack and refused to let her leave and collecting cases regarding the relative severity of physical invasions under Sixth Circuit precedent).

Examination of cases in which the Sixth Circuit has *affirmed* summary judgment for employers further illustrates that evidence of offensive or invasive touching will often be sufficient to support a hostile work environment claim at the summary judgment stage. For example, in *Hensman v. City of Riverview*, the Sixth Circuit affirmed summary judgment for an employer defendant where: the harassing coworker (1)

told plaintiff he was too distracted by plaintiff's looks to discuss work, (2) complimented plaintiff's perfume multiple times and "sniffed" her, (3) described her as "voluptuous" on two occasions, (4) made other crude comments, (5) hugged her on three occasions., 316 F. App'x 412, 416-417 (6th Cir. 2009). In explaining why summary judgment in favor of the employer was appropriate, the Sixth Circuit emphasized as particularly important that the harassing coworker "never propositioned [the plaintiff] or grabbed her sexually." *Id.* at 417. Another case illustrating this principle is *Nathan v. Great Lakes Water Auth.*, in which a plaintiff raised five incidents of harassment over a fifteen-month period, mostly regarding comments about plaintiff's breasts made during uniform inspections, but no one "ever physically threatened [plaintiff] or placed their hands on her." 992 F.3d 557, 569 (6th Cir. 2021) *but see Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (affirming summary judgment for an employer where a harassing coworker slid a pack of cigarettes under the plaintiff's bra strap and made crude comments/sexual propositions on two other occasions but emphasizing sporadic nature of the harassment).

Finally, the case of *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341 (6th Cir. 2005), is particularly instructive. In that case, two plaintiffs accused a supervisor of creating a hostile work environment. The Sixth Circuit concluded that the supervisor's actions towards one plaintiff, a

manager, were not sufficiently pervasive, hostile, or abusive to create a hostile work environment, but fact issues existed as to whether the supervisor's actions towards the other plaintiff, an assistant, were sufficiently severe.

The plaintiff manager identified only "three relatively isolated incidents over a period of approximately two and a half years." *Id*. at 351. The supervisor (1) told vulgar jokes, (2) twice placed his vibrating pager on plaintiff's thigh as they passed in the hall, and "most significantly," (3) "pulled at [the plaintiff's] overalls after she told him she was wearing a thong." *Id*. The Sixth Circuit concluded that while this conduct "could certainly be construed as offensive," it was "simply not substantial enough" to make out a hostile work environment claim. *Id*. at 352.

The Sixth Circuit further concluded that the plaintiff assistant's allegations, while "similar in kind," represented "more of an ongoing pattern of unwanted conduct and attention." *Id*. The plaintiff assistant identified seventeen incidents of harassment consisting mostly of crude remarks, but also one occasion where the harassing supervisor "tossed" a vibrating pager in plaintiff's lap and made crude remarks, and on several occasions pretended to high-five plaintiff, but then grabbed plaintiff's hand and refused to let go. *Id*. at 345, 352. On this basis, the Sixth Circuit concluded that the assistant's allegations "presented a

closer case that should not be disposed of at the summary judgment stage." *Id*. at 352.

As these cases indicate, unwanted and offensive actual physical touching—when taking place in an ongoing context of verbal and situational harassment—is often the dispositive factor as to whether conduct is sufficiently severe to survive summary judgment on the issue of whether a hostile work environment was created. Here, there were two incidents in which Hughes allegedly groped Scharp. These incidents of physical sexual contact occurred in a context of specific allegations of repeated unwanted comments, messages and other attention, and the harassment was more or less continuous for just over a year. Scharp's claims are analogous to the plaintiff assistant's claims in *Clark*—but even more serious. This evidence raises a sufficient factual question that a reasonable fact finder must resolve as to whether the work environment to which Scharp was subjected was objectively hostile.

A plaintiff must also have "subjectively perceived the environment to be hostile." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999). Defendant does not dispute that Scharp found the work environment subjectively hostile, and indeed Scharp testified that she frequently reported Hughes' harassment, and that it made her job more difficult. *See, e.g.,* Scharp Dep., ECF No. 19-7, PageID.457 ("It got to the point [where] I wouldn't move my bus over to the high school until the

very last minute so it didn't give [Hughes] time to come near me"). A reasonable finder of fact could conclude that Scharp was subjected to an objectively hostile work environment, and that she found the work environment hostile. Scharp's claim may proceed beyond summary judgment.

Defendant argues that at least some of Scharp's allegations are vague, conclusory, and insufficient to survive summary judgment. Def's. Mot., ECF No. 19, PageID.343-45. Defendant points to a case from the Sixth Circuit and two Eastern District of Michigan cases suggesting that mere allegations of "numerous," "constant," or "daily" sexual harassment complaints are insufficient to survive summary judgment. *Id.* Because Scharp has provided more than mere allegations of constant but nonspecific harassment, those cases are either distinguishable or do not support Defendant's position.

In the first case, *Johnson v. Ford Motor Co.*, No. 19-CV-10167, 2020 WL 2395205, at *11 (E.D. Mich. May 12, 2020), the court rejected a hostile work environment claim premised on race-based harassment, noting that there was "little evidence documenting the frequency and pervasiveness" of the alleged conduct. By contrast, Ms. Scharp was more specific in her allegations, and provided estimated dates. Moreover, the *Johnson* decision was reversed on appeal (after the briefs were filed in the instant case), and the Sixth Circuit concluded that the *Johnson*

plaintiff's allegation that her coworker was "constantly harassing" her with sexual propositions, coupled with specific references to various humiliating comments, was enough for a reasonable person to find the work environment hostile. *Johnson v. Ford Motor Co.*, 13 F.4th 493, 506 (6th Cir. 2021).

In another case in this district, *Rushton v. Experi-Metal, Inc.*, the court noted that the plaintiff made merely "vague allegations" of "black jokes" and uses of a potentially offensive nickname "without specific dates, times, or descriptions," and granted summary judgment to the defendant employer on that basis. No. 19-CV-11318, 2020 WL 7480548, at *9 (E.D. Mich. Dec. 18, 2020). But here, Scharp's allegations are more specific—they include approximate dates, details about the offensive comments and, most importantly, include multiple specific and detailed complaints of physical touching.

*Nathan v. Great Lakes Water Auth.*, another case cited by Defendant, does not support its position. 992 F.3d 557, 568 (6th Cir. 2021). In *Nathan*, the plaintiff's brief argued that the plaintiff had testified in her deposition that she was harassed "daily." The Sixth Circuit said: "If true, that fact would likely be sufficient to show that the environment at Great Lake was objectively hostile," but the court's review of the record showed that plaintiff never actually testified that she was harassed daily. *Id.* Here, Scharp actually testified that she was

21

frequently harassed. In sum, Scharp's complaints of harassment specifically and clearly identify harassment severe enough that a reasonable jury could find in Scharp's favor. Sharp has identified a genuine dispute of fact as to whether she was subjected to a hostile work environment.

### iii. A dispute of fact precludes summary judgment on the question of employer liability

Defendant argues that Scharp cannot show that Defendant should be liable because Defendant had no notice of Mr. Hughes' conduct until Scharp reported it in December 2018 to HR Director Madyun. Def's. Mot., ECF No. 19, PageID.346. Defendant argues that, as soon as Madyun learned of the harassment, Madyun promptly investigated the situation and ultimately decided to fire Mr. Hughes. *Id.*

Scharp does not appear to dispute that Defendant addressed her concerns about Mr. Hughes shortly after she submitted her written report directly to Mr. Madyun. Indeed, Scharp testified that she had a good working relationship with Madyun. Scharp Dep., ECF No. 19-7, PageID.453. Scharp argues, however, that Defendant had notice of Hughes' conduct as early as November 2017 when she first notified Ms. Searcy of her complaints. Pl's. Resp., ECF No. 20, PageID.587. Scharp does not appear to advance a theory of constructive notice, and instead relies on actual notice through Ms. Searcy. Defendant responds that Ms. Searcy was not a supervisor for purposes of Title VII or ELCRA.

Defendant also disputes whether Scharp actually made some of the reports she alleges she made to Ms. Searcy. Def's. Repl., ECF No. 23, PageID.699.

The Court must determine whether there is a genuine dispute of material fact as to whether Defendant had notice for purposes of Title VII and ELCRA. Next, because the harassing employee was the victim's co-worker, the Defendant will be liable under Title VII only if it was "negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). The ELCRA standard is essentially the same. *Elezovic v. Ford Motor Co.,* 697 N.W.2d 851, 861 (Mich. 2005) (for liability under ELCRA, plaintiff must show that employer "failed to take prompt and adequate remedial action upon reasonable notice of the creation of a hostile work environment.")(citation cleaned up).

### A. There is a dispute of fact as to whether Defendant was on notice for Title VII purposes

Defendant devotes much of its briefing on the notice issue to the standard used in the Sixth Circuit to determine whether the *harasser* is a plaintiff's supervisor, and thus whether an employer should be vicariously liable on that basis. But that is not at issue in this case, because it is undisputed that Hughes was not Scharp's supervisor—he was her co-worker. The proper standard for whether an employer has notice of *co-worker* harassment is set out in *Gallagher v. C.H. Robinson*

*Worldwide, Inc.*: "[a]n employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management." 567 F.3d 263, 277 (6th Cir. 2009); *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 414 (6th Cir. 2021)(affirming that *Gallagher* sets out the proper standard).

Ms. Searcy was, by her own admission, authorized to respond to harassment complaints in her discretion, or to forward them to Mr. Madyun. Searcy Dep., ECF No. 19-4, PageID.387. Scharp also believed—reasonably—that Ms. Searcy was the appropriate person to bring complaints to, and testified that during her training she was told that if she ever had a complaint, she should bring it to Ms. Searcy first, and follow the "chain of command." Scharp Dep., ECF No. 19-7, PageID.473.

Though Defendant and Ms. Searcy dispute that Scharp actually presented complaints to Ms. Searcy more than twice, Scharp testified that she did so at least five times. Pl's Resp., ECF No. 20, PageID.588-89 (summarizing Plaintiff's deposition testimony). At the summary judgment stage, the Court may not resolve this dispute. *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) ("[I]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited."). "[W]hen the non-moving party presents direct evidence

refuting the moving party's motion for summary judgment, the court must accept that evidence as true." *Id.* Therefore, Scharp has identified a genuine dispute of fact as to how many times she complained to Ms. Searcy, and what she complained about.[1] *See, e.g., Thaxter v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, No. 3:16-CV-02801, 2020 WL 3546818, at *12 (M.D. Tenn. June 30, 2020) ("The plaintiff alleges that she told two of her sergeants about Howard's conduct sometime in April 2015. Although the sergeants deny that she did, their denial simply creates a material factual dispute as to whether (and what) she did, in fact, tell them."); *Thomas v. Athlete's Foot*, No. 10-12558, 2012 WL 3467410, at *10 (E.D. Mich. July 20, 2012), (report and recommendation adopted, No. 10-CV-12558, 2012 WL 3489984 (E.D. Mich. Aug. 14, 2012)) (question of fact existed as to whether defendant employer had notice of

---

[1] To the extent that Defendant argues that Scharp's testimony about her statements to Ms. Searcy are inadmissible hearsay, that argument is unavailing, because this evidence is offered for its effects on Ms. Searcy and Defendant, not to prove the truth of the complaints Scharp made to Ms. Searcy. *See, e.g., Bailey v. USF Holland, Inc.*, 444 F. Supp. 2d 831, 847–48 (M.D. Tenn. 2006)(testimony regarding racial epithets used against plaintiff and complaints made by plaintiff about epithets were not hearsay, "but instead concerned 'verbal acts' offered to show (1) the fact that the epithets were used against the plaintiffs . . . and (2) that the defendant had knowledge of the problem") (citing *Southerland v. Sycamore*, 125 Fed. Appx. 14, 22 (6th Cir. 2004) (testimony "used to show that . . . officials had knowledge of the problem" was not hearsay)).

plaintiff's sexual harassment complaints where she made complaints to her direct supervisor who was authorized to receive such complaints by company policy). Therefore, there is at least a genuine dispute as to whether Defendant was on notice for purposes of Title VII.

**B. There is a dispute of fact as to whether Defendant was on notice for ELCRA purposes**

The standard for notice under ELCRA is similar to the Title VII standard: to establish actual notice, a plaintiff must show that she reported her harassment to someone in "higher management," which means "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Matthews v. Detroit Pub. Sch. Cmty. Dist.*, No. 19-13277, 2021 WL 4427176, at *7 (E.D. Mich. Sept. 27, 2021) (quoting *Sheridan v. Forest Hills Public Sch.*, 247 Mich. App. 611, 622 (Mich. Ct. App. 2001)).

A genuine issue of material fact exists as to whether Ms. Searcy had "significant influence" in the decision-making process of hiring, firing, and disciplining Hughes. At the very least, it is undisputed that she had "influence" in such matters, and Scharp testified that Ms. Searcy specifically hired Hughes. Searcy Dep., ECF No. 19-4, PageID.384-85. Scharp Dep., ECF No. 19-7, PageID.472. Scharp also testified, and Ms. Searcy admitted, that Searcy handled Scharp's initial verbal complaint

entirely on her own, and exercised her discretion not to escalate the complaint to Mr. Madyun. Scharp Dep., ECF No. 19-4, PageID.388-89, 408-409. This is enough to raise a question of fact as to whether Ms. Searcy had "significant influence" in personnel decisions regarding Mr. Hughes. *See, e.g., Doe v. Grand* Co., LLC, No. 18-CV-13123, 2020 WL 806031, at \*17 (E.D. Mich. Feb. 18, 2020) (denying summary judgment where genuine dispute existed as to whether two potential supervisors to whom plaintiff had control over hiring and personnel decisions).

The cases cited by Defendant are distinguishable. In the first, *Sheridan v. Forest Hills Public Schools*, a "head custodian" was not "higher management." 247 Mich. App. 611 (Mich. Ct. App. 2001). But the "head custodian" was a title given to an employee at the same level as the *Sheridan* plaintiff, and carried only the responsibility of "noting attendance" and "insuring that custodial work [was] properly completed." *Sheridan*, 247 Mich. App. at 615. Moreover, the "head custodian" had *no* authority over or input into hiring, termination, or disciplinary decisions, and the *Sheridan* plaintiff also did not regard the "head custodian" as her supervisor. *Id.* at 623-24; 625, n. 14. In the other case cited by Defendant, *Byers v. Honeytree II Ltd. P'ship.*, the person to whom the plaintiff complained was a "crew leader—" an employee who held the same position as the plaintiff, but merely had minor supervisory responsibilities. 2010 WL 481011, at \*1, 3 (Mich. Ct. App. Feb. 11, 2010).

The key inquiry is whether Ms. Searcy had "significant influence" over Hughes, and had "'actual authority to effectuate change in the workplace' by, for example, firing or disciplining 'the offensive employee.'" *Carr v. Detroit Bd. of Educ.*, No. 329832, 2017 WL 603565, at *3 (Mich. Ct. App. Feb. 14, 2017). A reasonable jury could find that Ms. Searcy had such authority—indeed she *did* discipline Hughes after Ms. Searcy's initial complaint. Therefore, a reasonable jury could find that Defendant had knowledge under ELCRA.

### C. There is a dispute of fact as to whether Defendant was negligent in controlling working conditions

As discussed above, "[i]f the harassing employee is the victim's co-worker," an employer is liable only if the employer "was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Under the negligence standard, "an employer must have known, or should have known, of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hamood v. Trinity Health Corp.*, No. 2:18-CV-13194, 2021 WL 735789, at *5 (E.D. Mich. Feb. 25, 2021) (quoting *Zeller v. Canadian Nat. Railway Co.*, 666 F. App'x 517, 525–26 (6th Cir. 2016)) (internal marks omitted).

Here, for the reasons described above, a reasonable jury could conclude that Defendant knew about the alleged harassment as early as Scharp's report of the first groping incident in late 2017. If a jury accepted

that as the time of notice, Defendant then failed to respond to known, pervasive sexual harassment for more than a year.[2] *See, e.g. Vance*, 570 U.S. at 449 (explaining that "evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant" to the negligence inquiry.) Thus, a reasonable jury could conclude that Defendant was negligent in its response.

### b. Retaliation Claim

Unlike a typical retaliation claim that accuses an employer or manager of taking adverse action against the complaining employee, Scharp's retaliation claim is premised on the conduct of her coworkers and her employer's failure to stop their behavior. "In appropriate circumstances, Title VII permits claims against an employer for coworker retaliation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014). The elements of such a "coworker retaliation" claim are: (1) retaliatory conduct by coworkers sufficiently severe so as to dissuade a

---

[2] It should be noted that some of the incidents Scharp complains of did not happen until at least the middle of 2018. While it may not be  clear exactly when Scharp's harassment became serious enough to constitute a hostile work environment on the state of the record presently before the Court, a reasonable jury could conclude that Defendant knew of the harassment and did nothing for at least several months.

reasonable worker from making or supporting a charge of discrimination; (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior; and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaint so inadequately that the response manifests indifference or unreasonableness under the circumstances. *Laster*, 746 F.3d at 732. Defendant Van Buren Schools contends that Scharp cannot show either (1) or (3).

### i. The alleged retaliation was likely not sufficiently severe

Defendant argues that the alleged retaliatory conduct was not sufficiently severe to dissuade a reasonable worker from making a charge of discrimination. Rather, Defendant argues, the conduct Scharp complains of was merely "petty slights, minor annoyances, and cold shoulders." Def's Mot., ECF No. 19, PageID.358. Scharp disagrees, pointing to several Facebook posts, a petition to rehire her harasser, and a number of other comments. Pl's. Resp., ECF No. 20, PageID.595-96 (summarizing Plaintiff's deposition testimony). Another employee, Peggy Caldwell, testified that she did not see anyone treat Ms. Scharp poorly after Hughes was fired. Caldwell Dep., ECF No. 19-11, PageID.508-509. But even viewing the facts in the light most favorable to Scharp and assuming all the harassment she complains of happened just as she says

it did, this behavior is insufficient to rise to the level of "conduct sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination."

Instead, the behavior about which Scharp complains more closely resembles the "petty slights or minor annoyances that often take place at work and that all employees experience"—the sort of conduct the Sixth Circuit and other courts have concluded does not constitute retaliation. *See, e.g., Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 373 (6th Cir. 2014); *Garcia v. Beaumont Health et. al.*, No. CV 19-11673, 2021 WL 4951668, at *10 (E.D. Mich. Oct. 25, 2021) ("Luca's alleged retaliatory conduct— telling three coworkers that Garcia was lying about the July 29 incident—is neither severe nor pervasive.")(collecting cases). *Moore v. Abbott Lab'ys*, 780 F. Supp. 2d 600, 623, 633 (S.D. Ohio 2011) (negative comments about plaintiff's job performance in the presence of another coworker, coworker's failure to shake plaintiff's hand, and similar incidents were not sufficiently severe); *Ryan v. Shulkin*, No. 1:15-CV-02384, 2017 WL 6270209, at *11 (N.D. Ohio Dec. 8, 2017) (". . . giving the cold shoulder is not sufficiently severe conduct to establish a retaliation claim").

## ii. **Defendant's response was not so unreasonable as to constitute indifference**

Even if the allegedly retaliatory conduct was serious enough to constitute retaliation, a reasonable jury could not conclude that

Defendant acted so unreasonably in its attempts to respond to the harassment as to constitute indifference towards or endorsement of the harassment. A response is generally adequate if it is "reasonably calculated to end the harassment." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008). Even viewing the facts in the light most favorable to Scharp, Mr. Madyun's convening of three meetings to address each of Scharp's complaints was "reasonably calculated" to end the alleged harassment, and indeed, appears to have succeeded in doing so because much if not all of the harassment stopped after the meetings. *See e.g.*, Scharp Dep., ECF No. 19-7, PageID.465, 467 (petition stopped circulating after Madyun held a meeting about it, Facebook comments "died down" after Madyun held meeting, and negative comments over bus radio subsided after "a while.").

Ultimately, Defendant responded in a reasonably diligent matter by promptly investigating Scharp's complaints and holding meetings with her co-workers for the purpose of discouraging future harassment—and much of the conduct did die down after Defendant took steps to stop it. *See, e.g. Garcia*, 2021 WL 4951668, at *10 (defendant employer's response was not unreasonable or indifferent where they promptly investigated defendant's complaint and took disciplinary action against coworker); *Williams v. E. I. Du Pont De Nemours & Co., Inc.*, No. 2:15-CV-02111-STA-DKV, 2016 WL 5416538, at *14 (W.D. Tenn. Sept. 28,

2016)(defendant's response was not indifferent or unreasonable where defendant conducted six investigations and sent investigators to interview plaintiff and other witnesses). *Ryan v. Shulkin*, No. 1:15-CV-02384, 2017 WL 6270209, at *11 (N.D. Ohio Dec. 8, 2017) (employer's response to complaints of coworker retaliation was reasonable where harassing conduct stopped after plaintiff reported it). For these reasons, the alleged retaliation was insufficiently serious to dissuade Scharp from making or maintaining her complaint (and, indeed, Scharp filed her EEOC charge after this retaliatory conduct), and in any event, Defendant responded in a reasonable manner to Scharp's concerns. Defendant is therefore entitled to summary judgment on Scharp's retaliation claim.

## IV. Conclusion

For the foregoing reasons, Defendant Van Buren Public Schools' motion for summary judgment is **DENIED** with respect to Plaintiff Alexis Scharp's hostile work environment claim, and **GRANTED** as to Scharp's retaliation claim.

**SO ORDERED.**

Dated: February 16, 2022      s/Terrence G. Berg
                              TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE